## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**GREGORY WAYNE COLBURN** *also*                                    **PETITIONER**
*known as Gregory Wayne Culburn*

**V.**                                        **CIVIL ACTION NO. 3:18cv117-TSL-JCG**

**PELICIA HALL,** *Commissioner,*                          **RESPONDENTS**
*Mississippi Department of*
*Corrections;* **and JIM HOOD,**
*Attorney General of the State of*
*Mississippi*

## REPORT AND RECOMMENDATION

BEFORE THE COURT is the Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus by a Person in State Custody, filed by Petitioner Gregory Wayne

Colburn. The Petition challenges Colburn's 2014 convictions and sentences for two

counts of exploitation of a vulnerable adult. Having considered the submissions of

the parties, the record, and relevant legal authority, the undersigned United States

Magistrate Judge recommends that Colburn's request for relief pursuant to 28

U.S.C. § 2254 be DENIED.

### I. BACKGROUND

Following a jury trial in the Circuit Court of Rankin County, Mississippi,

Petitioner Colburn was convicted of two counts of exploitation of a vulnerable adult,

Ruby Hill, a retired school teacher who during the time of the events in the

indictment, was 87 years old. Colburn was convicted of Count I which alleged that

he financially exploited Hill by depositing checks made payable to her into his

personal checking account. (ECF No. 10-9, at 76). Colburn was convicted of Count

II, which alleged that Colburn financially exploited Hill by creating a joint bank account with Hill, transferring funds belonging to Hill into the joint account, and then using those funds for his own profit or advantage. *Id.* at 76-77.

Ms. Hill never married and had no children. (ECF No. 10-5, at 141-42). Colburn met Hill and her mother in 1990 when he became their insurance agent and collected their burial insurance policy premiums in person. *Id.* at 125. Colburn and Hill became friends. Colburn began running simple errands for Hill, which became more frequent after Hill's mother died in 2004. Eventually, Colburn became Hill's driver and primary caregiver. *Id.* at 125-39. Hill moved to an assisted living facility in January 2012 after she was injured in a fall in October 2011. *Id.* at 99.

While she was in the hospital recovering from the fall, Hill executed a general power of attorney and an advanced healthcare directive, naming Colburn as her agent in both documents. (ECF No. 10-9, at 78-95). The power of attorney specifically prohibited Colburn from gifting or assigning any of Hill's assets to himself. *Id.* at 79. Both documents were notarized, and the notary testified at Colburn's trial that Hill appeared to know what she was doing when she executed them. (ECF No. 10-5, at 10).

Ms. Watts, an employee of the assisted living facility where Hill lived, testified that Colburn and Hill had a very loving and caring relationship. *Id.* at 104-105. Ms. Henderson, an employee of a Trustmark bank branch in Brookhaven, Mississippi, where Hill had banked for many years, testified that she was familiar with Colburn because he brought Hill to the bank. *Id.* at 60-62. Henderson testified

that she had no concerns about Colburn's relationship with Hill, submitting that Colburn seemed to care for Hill, and Hill seemed happy around Colburn. *Id.* Henderson testified that Hill always seemed to know what she was doing. *Id.* at 65.

In November 2011, Henderson saw Colburn at her branch without Hill. *Id.* at 74-75. Colburn presented the power of attorney to Henderson, and Henderson advised that her branch did not honor a power of attorney unless a branch manager approved the transaction. *Id.* at 75-77. Colburn maintains that Hill was frustrated by the bank's policy, and she decided to open a joint checking account with Colburn at Community Bank of Mississippi. *Id.* at 146-47.

On April 10, 2012, Colburn drove Hill to Community Bank, where Hill opened a joint checking account that allowed both she and Colburn to write checks from the account. *Id.* at 39, 146-47. Hill opened the account with an initial deposit of $125,000 from Hill's Trustmark account. (ECF No. 10-4, at 190). Community Banks' employee, Ms. Primer, testified at trial that Hill appeared to know what she was doing, and she did not appear to be coerced into opening the account. (ECF No. 10-5, at 40-42).

On February 22, 2012, Colburn deposited a $3,440 dividends check from AVA Equitable Life Insurance Company, payable to Hill and endorsed by Hill "pay to order of Greg Colburn", into his personal bank account.[1]  On May 10, 2012, Colburn deposited a check for $52,209.93 from "Federated Gov Income Securities – F"

---

1 This transaction is one of the bases of Count 2.

payable to "Gregory Wayne Colburn POA, FBO Ruby Frances Hill," into his personal bank account. (ECF No. 10-4, at 50; ECF No. 10-6, at 30-31). On May 14, 2012, Colburn purchased a $75,000 CD from the joint account with Hill, which was titled solely in Colburn's name. (ECF No. 10-4, at 43-45).[2] Shortly after he purchased the CD, Colburn used the CD as collateral to obtain a $60,000 personal loan. (ECF No. 10-4, at 43-45; ECF No. 10-6, at 3).

In May 2012, Colburn deposited a $20,000 check, drawn on Hill's Trustmark account, into his personal account. (ECF No. 10-6, at 26).[3] Colburn deposited a $1,500 check signed by him and drawn from the joint account with Hill into his personal checking account in June 2012.[4] Colburn deposited a $1,500 check signed by him and drawn from the joint account with Hill into his personal checking account in August 2012.[5] Colburn deposited a $3,931.31 check from the Bank of Forest payable to Ruby Hill, endorsed by Hill as "Ruby F. Hill to Greg Colburn," into his personal checking account in August 2012.[6]

While there was testimony that Hill and Colburn appeared to have a loving and caring relationship, and testimony that Ms. Hill appeared to have known what she was doing during banking transactions, there was also evidence of Ms. Hill's poor mental state. Dr. Perkins, who continued Hill's care as her primary treating

---

2 This transaction is one of the bases for Count I.
3 This transaction is one of the bases of Count 2.
4 This transaction is one of the bases of Count 1.
5 This transaction is one of the bases of Count 2.
6 This transaction is one of the bases of Count 2.

physician after she was released from the hospital, testified that Hill had been diagnosed with dementia prior to January 2012, when he began treating her. (ECF No. 10-4, at 2-7, 14-17). Dr. Perkins prescribed Hill medication for dementia, and he witnessed her cognitive impairment. *Id.* at 3. Dr. Perkins opined that Hill was unable to take care of her personal finances. *Id.* Dr. Perkins testified that dementia is a progressive illness and that there may have been "more lucid" moments, but he could not say if it was possible that Hill was "lucid enough" to make decisions during the time period described in the indictment. *Id.* at 7. Dr. Perkins testified that Hill needed assistance being brought to the medical clinic, with ambulation, and with answering questions. *Id.* at 3.

Investigator Russell Frazier of the Mississippi Attorney General's Office testified that he became involved after Trustmark contacted the Attorney General's Office regarding unusual financial transactions. (ECF No. 10-4, at 63). Frazier briefly interviewed Hill at the assisted-living facility. *Id.* at 65-67. Hill told Frazier she had known Colburn for a long time, but she could not recall how she met him or exactly how long she had known him. *Id.* at 68-69. When asked about a joint checking account with Colburn, Hill said that she did not have a joint checking account with Colburn. *Id.* Frazier showed Hill checks that Trustmark had provided Frazier. *Id.* Hill could not recall what the checks were for. *Id.*

During his investigation, Frazier interviewed Colburn. Colburn told Frazier that he suggested to Hill that she move some of her money into a CD to earn interest, and Hill agreed. (ECF No. 10-4, at 72). When asked why he put the CD

only in his name, Colburn said that "it must have been a mistake, because the CD was supposed to be in both of their names." *Id.* at 73. At trial, Colburn testified that "because the money was transferred from the joint account . . . I assumed that it would roll and be titled the same way as the account that it came out of." (ECF No. 10-6, at 7).

During the investigatory interview, Frazier asked Colburn if he had ever transferred any of Hill's money from her Trustmark account into his personal account, and Colburn said that he "may have put a few hundred dollars in there for running some errands and stuff." (ECF No. 10-4, at 74). But when asked specifically about the $20,000 check that he had deposited into his personal account, he said "that's what she [Hill] wanted to do with the money." *Id.* When asked about the $3,440 check payable to Hill from AXA Equitable Life Insurance Company, Colburn originally stated that the money went into the joint account with Hill. *Id.* at 75. But when Frazier told him the bank records indicated that money was deposited into his personal account, Colburn "advised [that] Ms. Hill wanted him to have it as a gift." *Id.*

When Frazier asked Colburn about the $52,209.93 check payable to Hill, Colburn originally stated that he put the money in Hill's account. *Id.* at 76. When Frazier told him the bank records indicated that the money was deposited into Colburn's personal account, Colburn explained that he must have made a mistake depositing the money into his personal account. *Id.* Frazier asked Colburn about a tour bus that Colburn had purchased. *Id.* At the interview, Colburn denied that he

6

used Hill's $52,000 to purchase the tour bus. *Id.* at 76-77. But at trial, Colburn testified that Hill donated the $52,209.93 check to Colburn so that Colburn's gospel trio, Men of Music, could purchase a vehicle to tour in. (ECF No. 10-6, at 3, 10). He also testified that Hill wanted to finance the entire tour bus, but he would not let her do that. *Id.* at 8-9. Instead, he used the $75,000 CD titled in his name as collateral to secure a loan for the remainder of the purchase price. *Id.*

Colburn was sentenced to serve a term of ten (10) years on Count I and ten (10) years on Count II, to run consecutively, in the custody of the Mississippi Department of Corrections. (ECF No. 10-7, at 18-19). Colburn was ordered to pay restitution in the amount of $78,000.00 on Count I and $79,581,24 on Count II. *Id.* at 19.

Colburn appealed his convictions and sentences to the Mississippi Supreme Court. On August 11, 2016, the Mississippi Supreme Court affirmed the judgment and sentences of the Rankin County Circuit Court in a written opinion. *Colburn v. State,* 201 So. 3d 462 (Miss. 2016). On February 23, 2018, Colburn filed the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, raising the following issues through counsel:

Ground One: The law under which Petitioner was indicted and convicted is unconstitutionally vague and overly broad

Ground Two: The indictment failed to state an indictable offense

Ground Three: There was insufficient evidence to support the verdict in violation of Petitioner's 5th and 6th Amendment rights under the United States Constitution

7

Respondents Pelicia E. Hall, Commissioner of MDOC, and Jim Hood, Attorney General of the State of Mississippi, do not challenge the timeliness of the Petition or dispute that Colburn exhausted his state court remedies.

## II. DISCUSSION

A.    <u>Standard of Review</u>

Substantively, the issue in a federal habeas proceeding is not whether there was an error in applying state law but instead whether there has been a denial of rights protected by the United States Constitution. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* The federal courts do not function as super appellate courts over the states to review errors under state law and may not correct errors of state law unless they also violate the constitutional rights of an accused. *See Smith v. Phillips,* 455 U.S. 209, 221 (1981); *Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir. 1981).

Even in matters affecting constitutional rights, federal courts have a very limited scope of review. The Court's authority to grant relief to a person held in custody pursuant to a state judgment is narrowly circumscribed by 28 U.S.C. § 2254 (d), which provides that a writ of habeas corpus shall not be granted unless the state court adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As recently summarized by the Fifth Circuit Court of Appeals:

> Because "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning," there are three ways a federal court can grant habeas relief: (1) if the state court decision was contrary to clearly established Supreme Court law; (2) if the state court decision involved an unreasonable application of clearly established Supreme Court law; or (3) if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. "AEDPA's standard is intentionally difficult to meet."

*Poree v. Collins*, 866 F.3d 235, 245 (5th Cir. 2017) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)).

B.    <u>Vagueness and Overbreadth</u>

Colburn challenges the terms "vulnerable adult" and "improper use" in the Mississippi Vulnerable Persons Act, Miss. Code Ann §§ 43-47-1 to 43-47-39 (Rev. 2015). The federal laws at issue are the doctrines of vagueness and overbreadth. The Government violates due process "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). A statute is overbroad if it extends state criminal authority beyond the proper reach of government into a private, constitutionally protected area of life such as speech or association. *See, e.g., Zwickler v. Koota*, 389 U.S. 241 (1967); *NAACP v. Alabama*, 377 U.S. 288 (1964); *Baggett v. Bullitt*, 377 U.S. 360 (1964).

9

1.    "Vulnerable Person"

The Mississippi Vulnerable Person Act provides that "[a]ny person who

willfully exploits a vulnerable person . . . where the value of the exploitation is Two

Hundred Fifty Dollars ($250) or more . . . shall be guilty of a felony . . . ." Miss. Code

Ann. § 43-47-19(2)(b). Under the Act, "vulnerable person"

> means a person, whether a minor or adult, whose ability to
> perform the normal activities of daily living or to provide
> for his or her own care or protection from abuse, neglect,
> exploitation or improper sexual contact is impaired due to
> a mental, emotional, physical or developmental disability
> or dysfunction, or brain damage or the infirmities of aging.
> The term "vulnerable person" also includes all residents or
> patients, regardless of age, in a care facility.

Miss. Code. Ann. § 43-47-5.

Colburn argues that the term "vulnerable person" is overbroad because it

includes people whose mental faculties are sound but who merely suffer physically.

Just as he did in briefing before the Mississippi Supreme Court, Colburn has "not

elaborate[d] on his argument or provide[d] any authority for his suggestion that the

Constitution somehow is violated by a law that protects from exploitation and abuse

those citizens who suffer from ailments other than mental incapacity or deficiency."

*Colburn,* 201 So. 2d at 468.

Colburn fails to address the State's position, credited by the Mississippi

Supreme Court, that "[a] person with a physical or emotional disability may be as

vulnerable to abuse, neglect, and [exploitation] as a person with a mental

impairment." *Id.* Colburn does not cite to any clearly established federal law as

10

decided by the United States Supreme Court that would undermine the Mississippi Supreme Court's decision. Colburn is not entitled to habeas relief on this claim.

2.    "Improper Use"

Colburn maintains that the term "improper use" in the Act is vague and overbroad. In attacking the constitutionality of the term "improper use," Colburn relies on *Decker v. State,* 66 So.3d 654 (Miss. 2011). In *Decker,* the Mississippi Supreme Court reversed a conviction for exploitation of a vulnerable adult, finding a Sixth Amendment violation where a jury instruction materially changed the charge made in the indictment. The Mississippi Supreme Court, in dicta, alluded to possible constitutional problems with the Mississippi Vulnerable Persons Act's breadth. The Mississippi Supreme Court took issue with the Act's term "exploitation" being defined as "the illegal or **improper use** of a vulnerable person of his resources for another's profit or advantage, **with or without the consent** of the vulnerable adult . . . ." *Id.* at 658 (emphasis in original).

In *Decker,* the State argued that any use of a vulnerable person's money for personal benefit would be an improper use, even with the vulnerable person's consent. The *Decker* Court observed in *dicta* that, under the State's interpretation, "a vulnerable adult [could not] give a spouse permission to withdraw money from a checking account to buy herself a present; or give one of her children or grandchildren permission to withdraw money to pay college tuition." *Id.* at 658.

Just as before the Mississippi Supreme Court, Colburn's briefing does not mention the salient fact that "in 2012, the year after [the Mississippi Supreme]

11

Court decided *Decker,* the Legislature amended the Act to include a definition of 'improper use,' as well as a definition of 'undue means.'" *Colburn,* 201 So. 3d at 467.

"Improper use" is now defined:

> "Improper use" means any use without the consent of the vulnerable person, any use with the consent of the vulnerable person if the consent is obtained by undue means, or any use that deprives the vulnerable person of his ability to obtain essential services or a lifestyle to which the vulnerable person has become accustomed and could have otherwise afforded.

Miss. Code. Ann. § 43-47-5(k) (Rev. 2015)

"Undue means" is defined as

> The use of deceit, power, or persuasion over a vulnerable person resulting in the vulnerable person being influenced to act otherwise than by his own free will or without adequate attention to the consequences.

Miss. Code Ann. § 43-47-5(p) (Rev. 2015).

The Mississippi Supreme Court rejected Colburn's argument that there was "absolutely no objective standard in determining the answers to what is improper use," concluding that the "broad, threshold issue of who is a vulnerable person does not render the statute unconstitutional" because "the recently enacted statutory definition of 'improper use' has, at least on its face, cured any vagueness problems that the exploitation statutes might have had and that troubled this Court in *Decker.*" *Colburn,* 201 So. 3d at 469. The Mississippi Supreme Court agreed with the State that there were four instances when the use of a vulnerable person's resources was considered "improper use"

(1) Any use without the consent of the vulnerable person;

(2) Any use with the consent of the vulnerable person if the consent is
obtained by undue means;

(3) Any use that deprives the vulnerable person of his ability to obtain
essential services or (4) obtain a lifestyle to which the vulnerable person
has become accustomed and could have otherwise afforded.

*Id.* at 469.

The Mississippi Supreme Court concluded that "the troubling hypothetical scenarios described by the *Decker* Court are no longer possible: under the statutes as currently written, a vulnerable person *may* consent to his or her spouse using their debit card to withdraw money to buy themselves a gift, and a vulnerable person *may* consent to his or her grandchild withdrawing money to use for tuition, as long as that consent was not obtained by undue means." *Id.*

Colburn contends that his actions were not illegal because he acted pursuant to Hill's power or attorney. At the time of the offenses, the Act plainly provided that "exploitation . . . may include actions taken pursuant to a power of attorney." Miss. Code Ann. § 43-47-5(i). The Act is not vague but instead clearly gives a person of ordinarily intelligence fair notice that a power of attorney does not absolve one's actions from scrutiny by the State. As for overbreadth, Colburn does not explain what private, constitutionally protected area of life the Act purportedly entrenches upon. He has stated no cognizable overbreadth claim.

The Mississippi Supreme Court determined that Colburn's argument that the statute was overbroad because it criminalized activity that was carried out under a

lawful power of attorney, not shown to be the result of undue influence or duress, was really an argument concerning the evidence, as opposed to the language of the statute. Colburn's allegation that "[t]he evidence submitted by the defense proved that Ms. Hill entrusted her resources, her future, her healthcare, her remainder of life to Mr. Colburn and she did so with full knowledge of her actions" is also an argument challenging the evidence. Colburn's habeas claims challenging the evidence are resolved later in this opinion. Colburn should be denied habeas relief on all of his vagueness and overbreadth claims.

C.    Sufficiency of the Indictment

Colburn alleges that the indictment against him was insufficient. According to Colburn, because every Count included the language, "without or without the consent of Ruby Hill," then "the grand jury could have found that Ruby Hill did in fact give her consent for every act alleged by the indictment, which if given without undue influence, is perfectly legal." (ECF No. 2, at 19-20). The Mississippi Supreme Court rejected this argument, finding that Colburn's indictment satisfied the requirements of Uniform Rule of Circuit and County Court Practice 7.06 because it tracked the language of the exploitation statute, was a plain, concise, and definite written statement of the essential facts constituting the offense charged, and fully notified Colburn of the nature and cause of the accusation. *Colburn,* 201 So. 2d at 470-71.

One Justice dissented, concluding that Colburn's indictment was insufficient because it did not explain whether Colburn was being accused of "illegal use" or

14

"improper use" of Hill's resources, and it did not disclose whether Colburn was alleged to have used Hill's resources without her consent or with her consent. *Id.* at 480-83 (Kitchens, J. dissenting). The dissenting Justice opined that if the State intended to prove improper use with the consent of the vulnerable person, then undue means was an element of the crime that should have been pled in the indictment. *Id.*

Colburn has not submitted a cognizable habeas claim. "The sufficiency of a state indictment is not a matter for federal habeas corpus review unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." *Alexander v. McCotter,* 775 F.2d 595, 598 (1985); *see Liner v. Phelps,* 731 F.2d 1201, 1203 (5th Cir.1984)*; Branch v. Estelle,* 631 F.2d 1229, 1233 (5th Cir.1980). The question whether a defective state indictment confers jurisdiction on the state trial court is a matter of state law. *Lavernia v. Lynaugh*, 845 F.2d 493 (5th Cir.1988). In a habeas proceeding, this Court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson,* 162 F.3d 385, 395 (5th Cir.1998); *Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir.1995).

Colburn challenged the sufficiency of the indictment before the Mississippi Supreme Court. The Mississippi Supreme Court found the indictment sufficient and by doing so, implicitly held that indictment was sufficient to confer jurisdiction. Colburn's brief on this issue is an argument concerning state law. Colburn's brief does not cite applicable federal habeas cases and does not attempt to establish that

the State court lacked jurisdiction. Colburn should be denied habeas relief on this claim.

D.    <u>Challenges to the Evidence</u>

Colburn maintains that the verdict "was against the overwhelming weight of the evidence presented at trial and contrary to law." (ECF No. 2, at 21). According to Colburn, "[t]he weight of evidence by the State was weak at best and failed to meet the elements of exploitation beyond a reasonable doubt." *Id.* at 21. Colburn maintains that no crime was proven because the evidence showed that he had Hill's power of attorney, there was testimony of a loving relationship between them, and there was testimony that Hill knew what she was doing during banking transactions.

There is clearly established federal law to determine the sufficiency of the evidence, and that standard is set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under *Jackson,* this Court can look only to the sufficiency of the evidence to determine whether the evidence, viewed in the light most favorable to the State, would have permitted a rational trier of fact to find Colburn guilty of the offenses. By making weight of the evidence arguments, Colburn fails to assert a federal habeas claim under 28 U.S.C. § 2254. Unlike a sufficiency of the evidence claim, a weight of the evidence claim requires an assessment of the credibility of the evidence presented at trial. *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v.*

16

*Smith*, 132 S.Ct. 2, 4 (2011). "[A] federal habeas corpus court faced with a record . . . that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326.

Even if the Court were to construe Colburn's brief as challenging the sufficiency of the evidence, the Court would not "focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). *Jackson* requires the Court to look to state law for the substantive elements of the offense, but "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 132 S.Ct. 2060, 2064 (2012). *Jackson* claims "face a high bar in federal proceedings because they are subject to two layers of judicial deference." *Id.* at 2062. In the first layer, a state appeals court reviewing the sufficiency of the evidence sets aside the jury's verdict "only if no rational trier of fact could have agreed with the jury." *Id.* In the second layer, a federal court grants habeas relief only upon a finding that the state court's rejection of a sufficiency-of-the-evidence claim was "objectively unreasonable." *Id.*

Where, as here, "a state appellate court has conducted a thoughtful review of the evidence," its determination of the sufficiency of the evidence "is entitled to great deference." *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir.1993). The United States Supreme Court has stressed the high level of deference that must be afforded

17

to state court decisions. *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011). It has counseled that "[s]ection 2254(d) is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 131 S.Ct at 788. This high bar "ensure[s] that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Id.* at 787 (citing *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

The Mississippi Supreme Court thoroughly considered the elements of exploitation of a vulnerable adult and concluded as follows:

> Colburn's argument that "no crime was committed" because he had Hill's POA, and because there was testimony of a loving relationship and that Hill "knew what she was doing" during some of the banking transactions is unavailing. Simply put, his argument stops short of a full analysis of the elements of exploitation. Hill could have been perfectly lucid and intentional in opening an account – i.e., she could have given her consent – but if the jury believed that Colburn had used "deceit, power, or persuasion" to influence Hill to act "without adequate attention to the consequences," then he obtained her consent by undue means, which also is "improper" use under the Act.

*Colburn,* 201 So. 3d at 476-77.

Colburn has presented nothing in his Petition to overcome the deference afforded to the State court's decision. The Mississippi Supreme Court's rejection of Colburn's challenge to the evidence was not an objectively unreasonable application of *Jackson* to the facts. Habeas relief should be denied on this claim.

## III. RECOMMENDATION

Based on the above analysis, the undersigned recommends that Gregory Wayne Colburn's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus be denied and this case dismissed.

## IV. NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Local Uniform Civil Rule 72(a)(3),

> After service of a copy of the magistrate judge's report and recommendations, each party has fourteen days to serve and file written objections to the report and recommendations. A party must file objections with the clerk of court and serve them upon the other parties and submit them to the assigned district judge. Within seven days of service of the objection, the opposing party or parties must either serve and file a response or notify the district judge that they do not intend to respond to the objection.

L.U. Civ. R. 72(a)(3); *see* 28 U.S.C. § 636(b)(1).

An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects. The District Judge need not consider frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed findings, conclusions, and recommendations within fourteen (14) days of being served a copy shall be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion adopted by the Court to which he did not object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED,** this the 9th day of October, 2019.

*s/ John C. Gargiulo*
JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE